No. 24-60425

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,

*Petitioners,*

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

No. 24-60428

BUSINESS COALITION FOR CLEAN AIR; TEXAS OIL & GAS ASSOCIATION; TEXAS CHEMISTRY COUNCIL,

*Petitioners,*

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

On Petitions for Review of a Final Action
of the United States Environmental Protection Agency

## BRIEF FOR PETITIONERS

*(Counsel Listed on Inside Cover)*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

WILLIAM F. COLE
Deputy Solicitor General

KATELAND R. JACKSON
Assistant Solicitor General
Kateland.Jackson@oag.texas.gov

*Counsel for State of Texas and Texas Commission on Environmental Quality*

Aaron M. Streett
Matthew L. Kuryla
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855 (phone)
(713) 229-7855 (fax)
aaron.streett@bakerbotts.com

*Counsel for Business Coalition for Clean Air, Texas Oil & Gas Association, and Texas Chemistry Council*

## Certificate of Interested Persons

No. 24-60428

State of Texas; Texas Commission on Environmental Quality,

*Petitioners*,

*v.*

United States Environmental Protection Agency; Michael S. Regan, Administrator, United States Environmental Protection Agency,

*Respondents.*

_____

**No. 24-60428**

_____

Business Coalition for Clean Air; Texas Oil & Gas Association; Texas Chemistry Council,

*Petitioners*,

*v.*

United States Environmental Protection Agency; Michael S. Regan, Administrator, United States Environmental Protection Agency,

*Respondents.*

The undersigned counsel of record for Petitioners in Case No. 24-60428 certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

- Baker Botts L.L.P. (Petitioners' counsel)
- Business Coalition for Clean Air (Petitioner)

i

- Carter, Beau (Petitioners' counsel)
- Cole, William F., Deputy Solicitor General, Office of the Attorney General of Texas (Petitioners' Counsel)
- Garland, Merrick B., Attorney General, United States Department of Justice (Respondents' counsel)
- Kim, Todd, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice (Respondents' counsel)
- Kuryla, Matthew L. (Petitioners' counsel)
- Jackson, Kateland R., Assistant Solicitor General, Office of the Attorney General of Texas (Petitioners' Counsel)
- Nance, Earthea (Regional Administrator for Respondent United States Environmental Protection Agency)
- Paxton, Ken, Attorney General for the State of Texas (Petitioners' Counsel)
- Prieto, Jeffrey M. (General Counsel for Respondent United States Environmental Protection Agency)
- Regan, Michael S., Administrator, United States Environmental Protection Agency (Respondent)
- Streett, Aaron M. (Petitioner's counsel)
- State of Texas (Petitioner)
- Texas Chemistry Council (Petitioner)
- Texas Commission on Environmental Quality (Petitioner)

- Texas Oil & Gas Association (Petitioner)

- United States Environmental Protection Agency (Respondent)

- Webster, Brent, First Assistant Attorney General, Office of the Attorney General of Texas (Petitioners' Counsel)

/s/ Aaron M. Streett
Aaron M. Streett

## Statement Regarding Oral Argument

Petitioners respectfully request oral argument. The United States Environmental Protection Agency found that Texas failed to submit revisions to its state implementation plan for three moderate nonattainment areas under the 2015 national ambient air quality standards for ground-level ozone. That finding carries substantial collateral consequences, including the potential imposition of grave economic sanctions less than six months from now.

Texas proactively tried to avoid this predicament. Before EPA published its finding, Texas asked for a voluntary reclassification of the three nonattainment areas from a "moderate" classification to a "serious" one. By statute, EPA has no discretion to deny Texas's request. Texas expected—based on EPA's repeated and express representations in its rulemakings—that the request would obviate the need for EPA to address Texas's "moderate" area status. The challenged final rule reflects a stark turnabout from those prior assurances.

This case requires a careful understanding of intersecting provisions of the Clean Air Act and implicates foundational administrative-law principles, including the change-in-position doctrine, that this Court has expounded upon on multiple recent occasions (including as an en banc Court). And this Court recently heard oral argument in *Texas v. Environmental Protection Agency*, No. 23-60635 (5th Cir. argued Oct. 7, 2024), which arose from the same underlying factual circumstances, implicates many of the same legal issues, and is pending before this Court. For these reasons, Petitioners submit that oral argument would aid the Court's decisional process.

iv

# Table of Contents

Page

Certificate of Interested Persons ........................................................i

Statement Regarding Oral Argument ...............................................iv

Table of Authorities ........................................................................ vii

Introduction ...................................................................................... 1

Statement of Jurisdiction ................................................................. 4

Issues Presented ............................................................................... 5

Statement of the Case ...................................................................... 5

   I.   Statutory Framework............................................................... 5

      A.   The Clean Air Act's cooperative federalism ..................... 5

      B.   The Administrator's revision of the ozone NAAQS and ensuing statutory rights and duties ...................................... 6

          1.   Area designations ......................................................... 6

          2.   Nonattainment classifications........................................ 7

          3.   Reclassifications based on failure to attain .................... 7

          4.   Voluntary reclassifications............................................ 8

      C.   States' SIP obligations ....................................................... 9

      D.   Federal sanctions for States' failure to submit complete SIPs ........... 10

   II.   Factual Background and Administrative History ..................... 11

      A.   EPA's revision of the ozone NAAQS ................................ 11

      B.   EPA's reclassification of three Texas areas as moderate nonattainment areas and imposition of SIP-submission schedules ...................................................... 12

      C.   Texas's request for voluntary reclassification.................... 13

      D.   EPA's promulgation of the Final Rule and finding that Texas failed to complete SIP submissions for the three "moderate" areas ........................................................ 14

      E.   EPA approves the voluntary reclassification but nevertheless requires Texas to submit certain "moderate" SIP elements.............. 16

Summary of the Argument.............................................................. 18

Standard of Review ........................................................................20

Argument ................................................................................................ 21

    I.   The Final Rule's Retention of SIP Elements from Prior
        Classifications Exceeds EPA's Statutory Authority. ............................... 21

    II.  The Final Rule Undercuts Texas's Good-Faith Reliance on
        Existing Agency Policy. ......................................................................... 26

    III. The Final Rule Is Arbitrary and Capricious. ........................................... 30

Conclusion ............................................................................................. 34

Certificate of Service ............................................................................. 35

Certificate of Compliance ...................................................................... 35

# Table of Authorities

Page(s)

**Cases:**

*Alaska Prof'l Hunters Ass'n v. FAA*,
  177 F.3d 1030 (D.C. Cir. 1999) ........................................................26

*Azar v. Allina Health Servs.*,
  587 U.S. 566 (2019) ........................................................................27

*Chamber of Com. of U.S. v. U.S. Dep't of Lab.*,
  885 F.3d 360 (5th Cir. 2018) ...........................................................25

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012) ................................................................. 19, 27

*Clean Water Action v. EPA*,
  936 F.3d 308 (5th Cir. 2019) ...........................................................26

*DHS v. Regents of Univ. of Cal.*,
  591 U.S. 1 (2020) .......................................................... 21, 27, 28

*Env't Integrity Project v. EPA*,
  425 F.3d 992 (D.C. Cir. 2005) .........................................................27

*Exxon Corp. v. Dep't of Energy*,
  91 F.R.D. 26 (N.D. Tex. 1981) .........................................................29

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................. 27, 28

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ..................................................... 19, 20, 30

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ....................................................... 20

*Luminant Generation Co. v. EPA*,
  675 F.3d 917 (5th Cir. 2012) .................................................. 6, 9, 26

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ........................................................... 21, 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..........................................................................30

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ................................................................... 26, 27

*Physicians for Soc. Resp. v. Wheeler*,
  956 F.3d 634 (D.C. Cir. 2020) ................................................... 28

*R.J. Reynolds Vapor Co. v. Food & Drug Admin.*,
   65 F.4th 182 (5th Cir. 2023) ..........................................19, 26, 27, 28
*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
   120 F.4th 163 (5th Cir. 2024) ...................................................... 20
*Smiley v. Citibank (S.D.), N.A.*,
   517 U.S. 735 (1996) ............................................................... 30, 31
*Sw. Airlines v. FERC*,
   926 F.3d 851 (D.C. Cir. 2019) ...................................................... 28
*Texas v. Environmental Protection Agency*,
   No. 23-60635 (5th Cir. argued Oct. 7, 2024) ....................................iv
*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) .................................................. 5, 6, 21
*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
   985 F.3d 472 (5th Cir. 2021) .................................................... 21, 30
*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ..................................................................29
*Wages & White Lion Invs. v. Food & Drug Admin.*,
   90 F.4th 357 (5th Cir. 2024),
   *cert. granted*, 144 S. Ct. 2714 (2024) ....................... 3, 19, 27, 28, 29, 30
*Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*,
   16 F.4th 1130 (5th Cir. 2021) ...................................................... 21

**Constitutional Provisions, Statutes, and Rules:**

40 C.F.R.:
   § 51.1312 ...............................................................................25
   § 52.31 .................................................................................10
   pt. 50, App'x U ........................................................................7
5 U.S.C.:
   § 551(13) ..............................................................................33
   § 706(2)(A) ........................................................................ 20, 30
   § 706(2)(C) ........................................................................ 20, 30
42 U.S.C.:
   § 7407(a) ............................................................................... 9
   § 7407(d)(1)(A) ................................................................... 6, 21
   § 7407(d)(1)(A)(i) .................................................................. 6
   § 7407(d)(1)(A)(ii) .............................................................. 6, 22

§ 7407(d)(1)(A)(iii) ......................................................................... 7

§ 7407(d)(1)(B)(i)-(ii) ..................................................................... 7

§§ 7408-7409(b) .............................................................................. 6

§ 7409(a) .................................................................................... 6, 21

§ 7409(d)(1) ..................................................................................... 6

§ 7410(a)(1) ..................................................................................... 9

§ 7410(a)(2) ..................................................................................... 9

§ 7410(c)(1) ................................................................................... 11

§ 7410(k)(1)(B) .............................................................................. 10

§ 7410(m) ........................................................................................ 2

§ 7471 ............................................................................................. 9

§ 7502(a)(2)(A) .......................................................................... 7, 22

§ 7502(c)(1) ..................................................................................... 9

§ 7502(c)(3) ..................................................................................... 9

§ 7502(c)(5) ..................................................................................... 9

§ 7509 ............................................................................................. 1

§ 7509(a) .................................................................................... 1, 10

§ 7509(b)(1) .............................................................................. 10, 11

§ 7509(b)(2) ................................................................................... 10

§ 7511(a)(1) ................................................................... 7, 8, 12, 22

§ 7511(b)(2)(A) ......................................................................... 8, 24

§ 7511(b)(2)(A)(i) ........................................................................... 8

§ 7511(b)(2)(A)(ii) .......................................................................... 8

§ 7511(b)(3) ............................................................................... 8, 22

§ 7511a(b)(1) ................................................................................. 10

§ 7511a(b)(1)(A) ........................................................................... 25

§ 7511a(b)(2)(A) ........................................................................... 25

§ 7511a(b)-(e) ......................................................................... 10, 22

§ 7511a(c) ....................................................................................... 2

§ 7511a(c)(1) ................................................................................. 10

§ 7511a(c)(2)(B) ............................................................................ 25

§ 7511a(d) ..................................................................................... 10

§ 7511a(i) ........................................................... 8, 12, 22, 24, 33

§ 7607(b)(1) ..................................................................................... 5

§ 7607(d)(9)(A) ................................................................. 20, 30

§ 7607(d)(9)(C) ................................................................. 20, 30

80 Fed. Reg. 65,292 (Oct. 26, 2015) ....................................... 11

83 Fed. Reg.:

    10,376 (Mar. 9, 2018) ......................................................... 7

    25,776 (June 4, 2018) ......................................................... 11

    25,830 (June 4, 2018) .................................................... 11, 23

    35,136 (July 25, 2018) ....................................................... 11

87 Fed. Reg.:

    21,842 (Apr. 13, 2022) ................................................... 2, 12

    60,897 (Oct. 7, 2022) .......................... 1, 2, 3, 12, 13, 23, 29

88 Fed. Reg. 71,757 (October 18, 2023) ......................... 2, 15, 29

89 Fed. Reg.:

    5,145 (Jan. 26, 2024) ................................ 3, 4, 16, 17, 24, 25, 26

    51,829 (June 20, 2024) ........................................... 5, 29, 32

**Other Authorities:**

Fact Sheet, Final Rule: Findings of Failure to Submit State
    Implementation Plan Revisions for Reclassified Moderate
    Nonattainment Areas for the 2015 Ozone National Ambient Air
    Quality Standards (NAAQS), *available at*
    https://www.epa.gov/system/files/documents/2023-10/fact-sheet-
    2015-o3-mod-ffs.pdf ...................................................... 10, 11

Petition for Review, *Texas v. EPA*, No. 23-60635 (5th Cir. Dec. 15, 2023) ............ 15

Petitioners' Brief, *Texas v. EPA*, No. 23-60635 (5th Cir. Mar. 5, 2024) ................. 15

TCEQ Comment Letter (June 13, 2022), Docket No. EPA-HQ-OAR-
    2021-0742, *available at* https://www.regulations.gov/comment/EPA-
    HQ-OAR-2021-0742-0231 ................................................. 13

Voluntary Reclassification of Texas 2015 Ozone Standard Moderate
    Nonattainment Areas (Oct. 12, 2023) ............................... 2, 14

# Introduction

In October 2022, in response to negative comments about impossible timelines for States that the United Stated Environmental Protection Agency ("EPA") created after not meeting its own deadlines, EPA represented to all States that if they needed more time to comply with federal planning requirements, requesting reclassification was the solution. Relying on that representation, Texas voluntarily reclassified the ozone-emissions levels for three of its major urban areas—a decision that would subject Texas to more stringent emissions requirements and increased federal monitoring—to avoid an even *worse* outcome—federal sanctions. *See* C.I. 31, Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Marginal for the 2015 Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 60,897, 60,897-910 (Oct. 7, 2022) ; 42 U.S.C. § 7509.

Notably, EPA made the representation due to an emergency of EPA's own making. After missing multiple statutory deadlines, EPA determined that the Dallas, Houston, and San Antonio areas had failed to attain federal ozone-emission standards by the attainment date for their "marginal" degree-of-noncompliance classification and were therefore being reclassified to a "moderate" degree of nonattainment. 87 Fed. Reg. at 60,901. By statute, this determination required Texas to submit to EPA a plan, called a State Implementation Plan ("SIP"), to reduce emissions levels. 42 U.S.C. § 7509(a). Creating a SIP takes months and is a complex, time-consuming, and highly technical undertaking. EPA, however, gave Texas only three months to complete this impossible task. *See* 87 Fed. Reg. at 60,908.

But EPA reassured Texas and other States that there was a workaround to its artificially imposed deadline: voluntary reclassification. 87 Fed. Reg. at 60,907. In fact, EPA stated seven times in EPA's Final Rule that States could avoid the impossible three-month deadline by voluntarily reclassifying areas. *Id.* at 60,907. Although a reclassification would mean even more stringent federal requirements, *see* 42 U.S.C. § 7511a(c), it would also mean more time to complete the SIP—time which was necessary to avoid federal sanctions, *see id.* § 7410(m).

Heeding EPA's encouragement, Texas requested voluntarily reclassification of the degrees of nonattainment and accepted the consequences of doing so. C.I. 3, Voluntary Reclassification of Texas 2015 Ozone Standard Moderate Nonattainment Areas (Oct. 12, 2023). But being sanctioned by EPA was *not* one of those consequences—or, at least, it was not *supposed* to be. When the original three-month deadline for submitting the SIP had passed, EPA told Texas that it had missed the SIP deadline, ignoring that the voluntary reclassification had *postponed* the deadline. *See* C.I. 2, Findings of Failure to Submit State Implementation Plan Revisions for Reclassified Moderate Nonattainment Areas for the 2015 Ozone National Ambient Air Quality Standards (NAAQS), 88 Fed. Reg. 71,757, 71,758 (Oct. 18, 2023); *see id.* at 71,759. Conspicuously, in doing so, EPA even admitted that EPA itself had missed at least two of its statutory deadlines. *Compare, e.g.*, Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Marginal for the 2015 Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 21,842, 21,844 (Apr. 13, 2022) (Proposed Rule), *with, e.g.*, 87 Fed. Reg. at 60,897 (Oct. 7, 2022) (Final Rule). Abandoning its prior assurances

about voluntary reclassification, EPA pulled what this Court has called a "surprise switcheroo" and sanctioned Texas. *See Wages & White Lion Invs. v. Food & Drug Admin.*, 90 F.4th 357, 386 (5th Cir. 2024) (en banc), *cert. granted*, 144 S. Ct. 2714 (2024).

Worse still, EPA's change in position about reclassification was inconsistent. On the one hand, EPA maintained that the reclassification did not extend the SIP deadline. *See* 87 Fed. Reg. at 60,897. But on the other hand, EPA claimed that Texas was subject to the "serious" nonattainment-classification requirements because of the voluntary reclassification. And relevant to this appeal, EPA claimed that Texas was simultaneously subject to the "moderate" nonattainment requirements because of EPA's original "moderate" classification. Clearly established law in this circuit does not allow EPA to change its position like that and then attempt to sanction Texas based on its changed position. *See White Lion*, 90 F.4th at 386.

Still, on January 26, 2024, EPA published a Proposed Rule granting Texas's request for reclassification. *See* C.I. 1, Clean Air Act Reclassification of the San Antonio, Dallas-Fort Worth, and Houston-Galveston-Brazoria Ozone Nonattainment Areas; TX, 89 Fed. Reg. 5,145 (Jan. 26, 2024). In addressing how the reclassification would affect its final finding that Texas had missed the SIP deadline, EPA explained that "when an ozone nonattainment area is reclassified, the attainment date for the prior classification is superseded by the attainment date for the new classification." *Id.* at 5,147. Thus, "once a nonattainment area has been reclassified and as a result has a new statutory attainment deadline, certain SIP elements . . . which are tied to the applicable attainment deadline are no longer required for the lower, superseded

classification." *Id.* EPA even acknowledged that requiring "a state to submit or EPA to act on such SIP elements would make no logical or practical sense." *Id.* EPA therefore proposed "to determine that the October 2023 findings that EPA published with respect to SIP revisions" for three specified SIP elements "are now moot, and that the associated deadlines triggered by the October 2023 findings for imposition of sanctions or promulgation of a [federal implementation plan]" no longer apply with respect to these three identified elements." *Id.* (cleaned up).

Five months later, on June 20, 2024, EPA published its Final Rule setting the date for the Texas Commission on Environmental Quality ("TCEQ") to submit revised SIPs addressing the "serious" ozone nonattainment requirements. As previewed in EPA's proposal, the Final Rule mooted only certain requirements related to the prior classification of the three relevant nonattainment areas: (1) a demonstration of attainment by the prior attainment date; (2) a control-measure analysis tied to the prior attainment date; and (3) contingency measures specifically related to the area's failure to attain by the prior attainment date. The Final Rule took effect on July 22, 2024.

This Court should vacate and set aside the portion of the Final Rule requiring Texas to submit the remaining "moderate" plan requirements before SIP revisions are due for the higher "serious" nonattainment classification.

## Statement of Jurisdiction

On June 20, 2024, EPA published its finding that Texas remained obligated to submit as part of its pSIP revisions for three nonattainment areas for the 2015 ozone National Ambient Air Quality Standards ("NAAQS") certain requirements that

apply to nonattainment areas classified as "moderate" by the date those "moderate" elements were (formerly) due even after Texas voluntarily reclassified those nonattainment areas to "serious." That finding was included as part of the final action entitled "Clean Air Act Reclassification of the San Antonio, Dallas-Fort Worth, and Houston-Galveston-Brazoria Ozone Nonattainment Areas; TX," published at 89 Fed. Reg. 51,829 (June 20, 2024). Petitioners timely petitioned for review of this finding on August 19, 2024, Pet. for Review, ECF No. 1-2, invoking this Court's jurisdiction under 42 U.S.C. § 7607(b)(1).

## Issues Presented

1. Whether EPA exceeded its statutory authority by requiring Texas to satisfy SIP elements from prior classifications.

2. Whether EPA failed to acknowledge Petitioners' good-faith reliance interests before issuing the Final Rule.

3. Whether the Final Rule is arbitrary and capricious.

## Statement of the Case

### I. Statutory Framework

### A.    The Clean Air Act's cooperative federalism

The Clean Air Act is "an experiment in cooperative federalism" through which Congress "establishe[d] a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016). Congress tasked EPA with setting air-quality standards, referred to as the NAAQS, but Congress ensured that States would play the primary

role in implementing the NAAQS. *Id.* "This division of responsibility between the states and the federal government 'reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government.'" *Id.* (quoting *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012)). It "indicates a congressional preference that states, not EPA, drive the regulatory process." *Id.* This division of labor between EPA and the States, and its concordant respect for the States' role within the Act's regulatory framework, is reflected in the provisions discussed below, all of which are pertinent to these petitions for review.

## B.    The Administrator's revision of the ozone NAAQS and ensuing statutory rights and duties

The Act directs the EPA Administrator to establish primary and secondary NAAQS for ozone at the level needed to protect public health and welfare. 42 U.S.C. § 7409(a); *id.* §§ 7408-7409(b) (reflecting that primary standards protect public health, while secondary standards protect public welfare). Every five years, the Administrator must revise each NAAQS as appropriate. *Id.* § 7409(d)(1). New or revised NAAQS kick off a host of obligations for both EPA and the States.

### 1.    Area designations

Within a year of the promulgation of a new or revised ozone NAAQS, the Governor of each State must "submit to the [EPA] Administrator a list of all areas (or portions thereof) in the State" designated as either "nonattainment," "attainment," or "unclassifiable." *Id.* § 7407(d)(1)(A). A "nonattainment" area is one that "does not meet" the NAAQS. *Id.* § 7407(d)(1)(A)(i). An "attainment" area is one that does meet the NAAQS. *Id.* § 7407(d)(1)(A)(ii). And an "unclassifiable" area is

one "that cannot be classified on the basis of available information as meeting or not meeting the [NAAQS]." *Id*. § 7407(d)(1)(A)(iii). The Administrator then finalizes area designations for the NAAQS by either promulgating a Governor's designations or making modifications to those designations, which the Act allows in limited circumstances. *Id*. § 7407(d)(1)(B)(i)-(ii).

### 2.  Nonattainment classifications

When an area is designated as nonattainment for ozone, the Administrator must classify the area based on its degree of nonattainment. "Each area designated nonattainment for ozone" shall be classified as "marginal," "moderate," "serious," "severe," or "extreme" based on its "design value." *Id*. § 7511(a)(1); *see* 40 C.F.R. pt. 50, App'x U (reflecting how EPA calculates ozone design values); Implementation of the 2015 National Ambient Air Quality Standards for Ozone: Nonattainment Area Classifications Approach, 83 Fed. Reg. 10,376 (Mar. 9, 2018) (establishing the air-quality thresholds that define the classifications assigned to all nonattainment areas for the 2015 ozone NAAQS).

### 3.  Reclassifications based on failure to attain

States must meet deadlines, or "attainment dates," by which nonattainment areas need to reach attainment status. 42 U.S.C. § 7502(a)(2)(A). An area classified as a "marginal" ozone-nonattainment area—the least stringent nonattainment level— has three years from the date of initial designation as nonattainment to reach attainment status, *id*. § 7511(a)(1); an area designated "moderate"—the next level—has six years to reach attainment status, *id*.; an area designated "serious"—the next

level—has nine years to reach attainment status, *id.*; and so on, *id.* At the conclusion of the applicable period, the Administrator recalculates the area's design value to determine "whether the area attained the standard by [the attainment] date." *Id.* § 7511(b)(2)(A). If an area fails to attain the NAAQS by its deadline, *see id.* § 7511(a)(1), the Administrator must reclassify the area to "the higher of . . . the next higher classification" or "the classification applicable to the area's design value," *id.* § 7511(b)(2)(A)(i), (ii).

Reclassifications also require new SIP revisions and attainment deadlines. In that regard, the Act requires reclassified areas to meet the applicable classification's requirements "according to the schedules prescribed in connection with such requirements, except that the Administrator may adjust any applicable deadlines (other than attainment dates) to the extent such adjustment is necessary or appropriate to assure consistency among the required submissions." *Id.* § 7511a(i).

### 4. Voluntary reclassifications

If a State concludes that it needs more time to attain the NAAQS, it can seek voluntary reclassification. The Act provides that a State may request, at any time, to reclassify a nonattainment area in that State to a higher classification. *Id.* § 7511(b)(3). The administrator "shall" grant any such request and is required to "publish a notice in the Federal Register of any such request and of action by the Administrator granting the request." *Id.*

## C.  States' SIP obligations

To implement the NAAQS, "states must adopt and administer [SIPs]," *Luminant*, 675 F.3d at 921, which "provide[] for implementation, maintenance, and enforcement" of the NAAQS within their borders, 42 U.S.C. § 7410(a)(1). After the Administrator establishes or revises the NAAQS, States have three years (or such shorter period as EPA prescribes) to submit SIPs or SIP revisions specifying how the NAAQS will be met and including numerous congressionally mandated SIP components. *Id.* §§ 7407(a), 7410(a)(1)-(2).

For attainment or unclassifiable areas, States need only meet the Act's general SIP requirements and implement standard emission-control measures, such as preventing significant deterioration of air quality. *See id*. §§ 7410(a)(2), 7471. For nonattainment areas, the Act imposes more onerous requirements, including that States establish more stringent permitting programs for pollution sources, *see id*. § 7502(c)(5), submit "comprehensive, accurate, current inventor[ies] of actual emissions from all sources," *id*. § 7502(c)(3), and demonstrate that they intend to implement "all reasonably available control measures" ("RACM") and "reasonably available control technology" ("RACT"), *id*. § 7502(c)(1). These requirements, especially the requirement for a State to implement RACT, frequently result in the State issuing mandates for further emissions controls on stationary sources owned by industry petitioners and their members. These emissions controls often require great capital investments, higher operating costs, and take years to implement, exacerbating the burden to industry and hindering Texas's economic position.

The Act requires additional, and more burdensome, planning steps at each ozone nonattainment classification level. *See id.* § 7511a(b)-(e). States with "moderate" nonattainment areas, for example, must satisfy all the requirements for "marginal" areas plus several others, such as planning for significant annual reductions in emissions of volatile organic compounds ("VOCs") and nitrogen oxides ("$NO_x$"). *Id.* § 7511a(b)(1). To use another illustration, States with "serious" nonattainment areas must satisfy all "moderate" area requirements and several others, including enhanced monitoring of ozone, $NO_x$, and VOCs. *Id.* § 7511a(c)(1); *see also, e.g., id.* § 7511a(d) (setting out planning requirements for "severe" nonattainment areas).

### D. Federal sanctions for States' failure to submit complete SIPs

Within six months of a State's deadline to submit a SIP, the Administrator must determine whether the State's submission meets the minimum completeness criteria established by the Act. *Id.* § 7410(k)(1)(B). If the Administrator finds that "a State has failed, for an area designated nonattainment[,] . . . to submit a plan, or to submit 1 or more of the elements (as determined by the Administrator)" required by the Act for such an area, the Administrator must impose sanctions on the State "unless such deficiency has been corrected within 18 months after the finding." *Id.* § 7509(a).

There are two types of sanctions for a failure to submit: offset sanctions and highway sanctions. *Id.* § 7509(b)(1), (2). In this circumstance, offset sanctions require the State to ensure that VOCs or $NO_x$ emissions from a new or modified major source in the area are "offset" by emission reductions from other sources in the area at a ratio of at least 2 to 1. *See* 40 C.F.R. § 52.31; *see also* Fact Sheet, Final Rule: Findings of

Failure to Submit State Implementation Plan Revisions for Reclassified Moderate Nonattainment Areas for the 2015 Ozone National Ambient Air Quality Standards (NAAQS), *available at* https://www.epa.gov/system/files/documents/2023-10/fact-sheet-2015-o3-mod-ffs.pdf.

Highway sanctions, by contrast, compel the Federal Highway Administration to impose a funding moratorium on most projects. 42 U.S.C. § 7509(b)(1). Beyond the threat of sanctions, a finding of failure to submit establishes a two-year window for EPA to either approve a State's SIP revisions or issue a Federal Implementation Plan ("FIP"), addressing emissions-control requirements for the affected areas. *Id.* § 7410(c)(1).

## II.  Factual Background and Administrative History

### A.  EPA's revision of the ozone NAAQS

In October 2015, the Administrator revised the ozone NAAQS to make them more stringent. National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292 (Oct. 26, 2015) (promulgated Oct. 1, 2015). Based on these new standards, in 2018, the Administrator designated three Texas areas of substantial size and economic significance—the Dallas, Houston, and San Antonio areas—as "marginal" nonattainment areas. Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 Fed. Reg. 25,776, 25,830 (June 4, 2018); Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards—San Antonio, Texas Area, 83 Fed. Reg. 35,136, 35,136 (July 25, 2018). EPA then set the attainment date for the Dallas and Houston areas as August 3, 2021,

and the attainment date for the San Antonio area as September 24, 2021. *See* 42 U.S.C. § 7511(a)(1).

## B. EPA's reclassification of three Texas areas as "moderate" nonattainment areas and imposition of SIP-submission schedules

In April 2022, six months after the attainment dates had passed, EPA proposed to find that the three Texas areas failed to attain the standards by their applicable attainment dates. *See* 87 Fed. Reg. at 21,842, 21,844. EPA then delayed nearly seven more months before finalizing the rule. *See* C.I. 31, 87 Fed. Reg. at 60,897.

In that Final Rule, EPA found that the three Texas areas failed to attain the standards by the attainment date, *id.* at 60,900, the effect of which was "that these areas" were to be "reclassified by operation of law to 'Moderate' nonattainment . . . on November 7, 2022," *id.* at 60,897.

That reclassification, and the attendant delay in finalizing it, raised an important question: what would be the States' new deadline for providing EPA with "moderate" SIP submissions? Citing 42 U.S.C. § 7511a(i) and invoking the "combination of constraints dictated by the statutory and regulatory requirements for reclassified ozone areas, particularly at the lower classifications," EPA imposed a three-month deadline of January 1, 2023. 87 Fed. Reg. at 60,908.

In setting that deadline, EPA admitted that it missed its own deadline—the "statutory due date" for the reclassification action—by more than eight months. *Id.* (noting the February 3, 2022, statutory deadline). And EPA also admitted that the January 1 deadline would be "challenging" for many States to meet. *Id.* EPA did not quibble with the commenters who called out the "short planning timeframe available

to states with newly reclassified Moderate areas" and conceded that "delays in this rulemaking have reduced the time" that States would have to complete their SIPs. *Id.* at 60,907; *see also* TCEQ Comment Letter (June 13, 2022), Docket No. EPA-HQ-OAR-2021-0742, *available at* https://www.regulations.gov/comment/EPA-HQ-OAR-2021-0742-0231 ("It is impracticable, if not impossible, for affected sources to comply with the new rule on the EPA's proposed timeline.").

But EPA was unmoved. No less than seven times throughout its Final Rule, it justified its harsh approach by noting a statutory safety valve: voluntary reclassification. EPA emphasized that "a state may at any time request—and EPA must grant—a voluntary reclassification." 87 Fed. Reg. at 60,907. That mattered, according to EPA, because voluntary reclassification was one way that "states c[ould] anticipate and manage the tight timeframes to develop required SIP revisions." *Id.* This was true because a voluntary reclassification would "reset[] the area's attainment date into the future, and would therefore likely provide more time and flexibility for developing and submitting required SIP revisions." *Id.* at 60,909. States would be "fully within their rights to recognize" that an area may not attain by the attainment date and to take steps to "put themselves in a better position for longer planning and implementation timeframes." *Id.* at 60,910.

## C. Texas's request for voluntary reclassification

EPA's action left Texas in a bind. Faced with the possibility of sanctions on the one hand and voluntary reclassification (and its attendant burdens) on the other, Texas chose the latter.

In October 2023, Governor Abbott sent a letter to the Administrator exercising his authority under the Act "to request voluntary reclassification . . . from moderate to serious." C.I. 3, Voluntary Reclassification of Texas 2015 Ozone Standard Moderate Nonattainment Areas (Oct. 12, 2023).

His letter observed that "EPA has left Texas no choice but to request voluntary reclassification of these areas by establishing absurd [SIP] submittal deadlines, changing the accepted approaches for how to meet [Act] requirements while SIP development is in progress, and failing to provide states with timely guidance on how to meet these moving goalposts, all of which demonstrates disrespect for limited state resources." *Id.*

The letter objected that "EPA knowingly set states up to fail by establishing a deadline that was impossible to meet" and that "EPA's compressed timeline did not provide a reasonable amount of time for Texas to develop new attainment plans, evaluate controls, conduct rulemaking, and give affected businesses sufficient time to implement control requirements that could demonstrate attainment by December 2023." *Id.* And based on the "risk of potential sanctions and federal implementation plans that could have lasting detrimental impacts to industry in [Texas]," Governor Abbott had no choice but to "request voluntary reclassification . . . to protect the Texas economy." *Id.*

### D. EPA's promulgation of the Final Rule and finding that Texas failed to complete SIP submissions for the three "moderate" areas

Just six days later, and without mention of Texas's request for reclassification, EPA published a Final Rule in the Federal Register finding that Texas, along with

ten other States, "failed to submit specific required SIP elements, which were due no later than January 1, 2023." C.I. 2, 88 Fed. Reg. at 71,758; *see id.* at 71,759 (indicating that the three Texas areas each failed to submit eight required SIP elements).

In that October 2023 finding, EPA indicated that it would apply offset sanctions if it "has not affirmatively determined that [Texas] has made the required complete SIP submittal for an area within 18 months of the effective date of this action." *Id.* at 71,759. And if EPA "has *not* affirmatively determined that the State has made the required complete SIP submittal within 6 months after the offset sanction is imposed, then the highway funding sanction will apply in the affected nonattainment area." *Id.* (emphasis added). As EPA recognized, this action triggered an independent obligation for EPA to "promulgate a FIP no later than 2 years after issuance of the finding of failure to submit if the affected State has not submitted, and the EPA has not approved, the required SIP submittal." *Id.*

After EPA published this Final Rule, Texas timely petitioned this Court for review of EPA's finding of failure to submit. *See* Petition for Review, *Texas v. EPA*, No. 23-60635 (5th Cir. Dec. 15, 2023). Texas argued that EPA's Final Rule was unlawful and should be set aside because it violated basic principles of administrative law. Specifically, Texas argued that the Final Rule robbed Texas of fair notice because it departed from EPA's prior representations that voluntary reclassification would allow Texas sufficient time to meet otherwise impossible SIP-submission deadlines and by penalizing Texas for relying in good faith on those representations. *See* Petitioners' Brief at 17-22, *Texas v. EPA*, No. 23-60635 (5th Cir. Mar. 5, 2024). That appeal was argued in this Court last month and remains pending.

### E. EPA approves the voluntary reclassification but nevertheless requires Texas to submit certain "moderate" SIP elements

Following its finding of failure to submit, on January 26, 2024, EPA published a Proposed Rule granting Texas's request for reclassification. *See* C.I. 1, Clean Air Act Reclassification of the San Antonio, Dallas-Fort Worth, and Houston-Galveston-Brazoria Ozone Nonattainment Areas; TX, 89 Fed. Reg. 5,145 (Jan. 26, 2024). EPA explained that it "read[] the relevant statutory language to provide no discretion to deny the request made in this instance." *Id.* at 5,146. In addressing how the reclassification would affect its final finding from October 2023 that Texas had missed the SIP submission deadline, EPA proposed to interpret the Act as providing that "when an ozone nonattainment area is reclassified, the attainment date for the prior classification is superseded by the attainment date for the new classification." *Id.* at 5,147. Thus, "once a nonattainment area has been reclassified and as a result has a new statutory attainment deadline, certain SIP elements . . . which are tied to the applicable attainment deadline are no longer required for the lower, superseded classification." *Id.* EPA went so far as to say that requiring "a state to submit or EPA to act on such SIP elements would make no logical or practical sense." *Id.* EPA therefore proposed "to determine that the October 2023 findings" that Texas had missed the SIP submission deadline "are now moot, and that the associated deadlines triggered by the October 2023 findings for imposition of sanctions or promulgation of a FIP no longer apply with respect to these three identified elements." *Id.*

But, relevant here, EPA posited that "there remain several Moderate area SIP requirements that continue to be required after these areas are reclassified to

Serious." *Id.* Those elements are supposedly "unaffected because their meaning is not dependent upon the attainment date itself." *Id.* Both Texas and Industry Petitioners timely submitted comments objecting to EPA's proposal to hold Texas to "moderate" SIP requirements and the sanctions the State will face if the requirements are not satisfied. Specifically, TCEQ urged EPA to "consider Texas's reliance interests," which were frustrated in this case given that EPA purported to hold Texas to "moderate" attainment-area deadlines that EPA had "repeatedly reassured states, including Texas, that voluntary reclassification would provide an extended timeframe to meet." C.I. 11, TCEQ Comments at 1. Beyond those reliance interests, TCEQ explained that requiring Texas to meet *any* of the "moderate" SIP-submission deadlines was inconsistent with the plain language of the Act, EPA's own regulations, and common sense. *Id.* at 3-6. And Industry Petitioners explained that "[i]t is not logical to impose requirements or to continue sanction clocks associated with deadlines that have already passed for an area that will be subject to a more severe classification" and that requiring Texas to meet "moderate" requirements "has no basis in the statute and arbitrarily turns these elements into duplicative burdens." C.I. 10, TCC Comments at 4; C.I. 9, TXOGA Comments at 4.

On June 20, 2024, EPA published its Final Rule. The Final Rule granted Governor Abbott's request to voluntarily reclassify the Dallas, Houston, and San Antonio areas from "moderate" to "serious" for the 2015 ozone NAAQS. The Final Rule set the date for TCEQ to submit revised SIPs addressing the "serious" nonattainment requirements. The Final Rule also set deadlines for implementation of new rules addressing control technologies and enhanced vehicle-inspection and

maintenance programs. Notably, the Final Rule mooted only certain SIP-revision requirements related to the prior classification: (1) a demonstration of attainment by the prior attainment date; (2) a control-measure analysis tied to the prior attainment date; and (3) contingency measures specifically related to the area's failure to attain by the prior attainment date.

Under the Final Rule, Texas remained obligated to submit certain SIP requirements that apply to nonattainment areas classified as "moderate" by the date those "moderate" elements were (formerly) due even after those nonattainment areas were voluntarily reclassified to "serious." The Final Rule took effect on July 22, 2024. Petitioners timely petitioned for review of this finding on August 19, 2024.

## Summary of the Argument

**I.**    EPA has attempted to blur the line between classifications and their respective due dates by requiring Texas to comply with certain "moderate" SIP elements in Texas's "serious" SIP. But the classification categories are mutually exclusive with one other—that is, a State may hold only one classification at a time. EPA may not subject Texas to two different classifications at the same time nor to the functional equivalent thereof: submitting both "moderate" and "serious" SIP elements. When EPA threatened Texas with sanctions if it did not submit a SIP for its "moderate" classification in less than three months, Texas's only recourse was voluntary reclassification to allow more time to prepare its SIP. C.I. 3.

And under the plain text and structure of the Clean Air Act, Texas had the authority to reclassify the Dallas, Houston, and San Antonio areas as "serious." When Texas exercised this authority, it no longer needed to submit "moderate" SIP

elements by the "moderate" deadline but rather had more time to develop "serious" SIP submittals for these areas. Properly understood, those "serious" submittals must contain only "serious" elements by the "serious" deadline. Requiring any other elements mixes and matches obligations in a way that violates the statute.

**II.** EPA violated the good-faith-reliance doctrine by telling Texas that it could voluntarily reclassify to a "serious" classification and then requiring Texas to comply with "moderate" SIP elements too. Because EPA was required to give Texas notice of what elements the SIP needed to include, EPA cannot penalize Texas for relying on EPA's earlier notice—despite the fact that EPA changed its notice later. *See R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 189 (5th Cir. 2023) (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-57 (2012)). Even if EPA had lawfully changed its position about whether a "serious" reclassification absolved Texas of its "moderate" SIP requirements, EPA "cannot fault a party for relying in good faith on the prior [position]." *White Lion*, 90 F.4th at 384. Texas would never have pressed ahead with reclassification absent its well-founded belief that the reclassification would stave off an otherwise imminent sanctions clock. The good-faith-reliance doctrine prohibits exactly what EPA did here—"saying one thing, pulling a surprise switcheroo, and ignoring the reasonable reliance interests engendered by its previous statements." *Id.* at 386.

**III.** EPA acted arbitrarily and capriciously because it did not "reasonably explain[]," as the APA requires it to, why Texas would be bound to its previous "moderate" classification requirements after voluntarily reclassifying to a "serious" status. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). And not only did

EPA fail to reasonably explain its change in position, but the change defies all logic. After all, why would Congress impose lesser requirements, *in addition to* more stringent ones, on an area that will be subject to those more stringent requirements? And why would Congress do so for voluntary, but not for involuntary, classifications? There are simply no adequate answers to these questions. Moreover, EPA's successful encouragement for Texas to voluntarily reclassify shielded EPA against an arbitrary-or-capricious challenge to its concededly tight SIP-submission schedule. But such self-interest (such as preventing an arbitrary-or-capricious challenge) cannot reasonably explain—much less excuse—why EPA changed its position. Simply put, the change was textbook arbitrary-and-capricious conduct that this Court should reverse.

## Standard of Review

The APA empowers this Court to "hold unlawful and set aside" certain agency actions—including, as relevant here, a finding that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); *accord* 42 U.S.C. § 7607(d)(9)(A), (C). In determining whether an agency has acted contrary to statutory authority, the Court interprets the statute *de novo. See Rest. L. Ctr. v. U.S. Dep't of Lab.*, 120 F.4th 163, 170-71 (5th Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024)). "The APA's arbitrary-and-capricious standard"—the key standard at issue in this matter—"requires that agency action be reasonable and reasonably explained." *Prometheus Radio*, 592 U.S. at 423. "Put simply, [the Court] must set aside any action premised on

reasoning that fails to account for 'relevant factors' or evinces a 'clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). This review is "not toothless." *Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1136 (5th Cir. 2021). Indeed, "after [*DHS v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020)], it has serious bite." *Id.*

## Argument

### I.  The Final Rule's Retention of SIP Elements from Prior Classifications Exceeds EPA's Statutory Authority.

EPA's action rests on a novel (but erroneous) legal premise: that EPA can require Texas to adopt SIP elements for a no-longer-existing statutory classification even after Texas has voluntarily reclassified its attainment status. EPA's action reflects a fundamental misconception of the Act generally and nonattainment designations specifically. Properly understood, the Act renders EPA powerless to impose SIP requirements apart from the current nonattainment classification in a given area. EPA's insistence to the contrary must therefore be set aside.

**A.**  The text and structure of the Act make clear that SIP requirements are tied to an area's classification. Under the Act's cooperative-federalism framework, States and EPA play different parts in controlling and improving air quality. *Texas*, 829 F.3d at 411. EPA's role starts with setting the NAAQS. 42 U.S.C. § 7409(a). Then a State submits a list of recommended designations for all the areas within the State, and EPA designates each area as either attainment, nonattainment, or unclassifiable. *Id.* § 7407(d)(1)(A). EPA then classifies each nonattainment area as

"marginal," "moderate," "serious," "severe," or "extreme" based on its "design value," which is the metric of air quality used to assess attainment. *Id.* § 7511(a)(1). Once classified, the State is on the clock for reaching attainment status—*i.e.*, meeting the NAAQS in these areas, *id.* § 7407(d)(1)(A)(ii)—by a date certain that is tied to the area's classification, *id.* § 7502(a)(2)(A).

Relevant here, a "moderate" nonattainment area has six years to reach attainment status; and a "serious" area has nine. *Id.* § 7511(a)(1). But with greater time come greater (and more stringent) SIP requirements. *See id.* § 7511a(b)-(e). The Act's deadlines therefore recognize that the further an area is from attainment (as reflected by its classification), the greater the length of time that a State should have to undertake its attainment planning. If a "moderate" nonattainment area hits the six-year mark and has not reached attainment, EPA reclassifies it to a higher classification, and the Act resets the area's deadline as though it was originally classified in the higher classification. *Id.* § 7511a(i). In all cases, the State's SIP obligations are based on the area's classification.

The Act further provides States with discretionary authority, which acts as a "safety valve" for States: If the State needs more time for an area to attain the NAAQS, the Act allows the State to voluntarily take on a higher classification—that is, a heavier regulatory burden—in exchange for more time to reach attainment. *See id.* § 7511(b)(3). Thus, nonattainment areas can be reclassified in only two circumstances: by EPA granting a State's voluntary request (which EPA has no discretion to deny) and by operation of law upon the area's failure to attain by its operative attainment date.

Consider hypothetical Area A and Area B. After EPA set the NAAQS, EPA designated Area A as "serious" and Area B as "moderate" nonattainment. Over time, Area A began improving and was on pace to attain by its nine-year deadline. But population growth in Area B offset its progress toward attainment, leaving it static on emissions and thus unlikely to attain by its six-year deadline. Rather than waiting to fail to attain at the deadline in year six, the State (say, in year three) voluntarily requests reclassification of Area B to "serious" nonattainment. Area B's regulatory burden thus becomes greater, but Area B can begin planning in year three to attain by year nine rather than waiting for the inevitable reclassification by failure to attain in year six. The Act thus treats Area A and Area B alike both for timeline and regulatory burdens. This is the common-sense setup prescribed by the Act.

But EPA's Final Rule in this case scrambles that statutory structure. The three areas at issue here were originally classified as "marginal" nonattainment areas. *See* 83 Fed. Reg. at 25,830. When EPA concluded those areas failed to attain by the three-year deadline, EPA reclassified them to "moderate" nonattainment; but EPA gave Texas less than three months to establish how it would meet these new requirements via SIP submittals, 87 Fed. Reg. at 60,908, and Texas's failure to meet that deadline risked sanctions. Texas's only recourse was voluntary reclassification from "moderate" to "serious" nonattainment—with the attendant increase in regulatory stringency—to allow more time to prepare SIP submittals and reach attainment. C.I. 3. By using its discretionary, safety-valve authority to request reclassification, Texas no longer needed to submit "moderate" SIP elements but instead had more

time to develop "serious" SIP submittals for these areas. This follows from the plain text and structure of the Act.

**B.**    Unhappy with the leeway that the Act gives to States, EPA has conjured up a theory of SIP requirements divorced from an area's classification that purports to extend SIP elements even after reclassification. According to EPA, if an area starts out as "moderate" but later reclassifies to "serious," the area maintains some "moderate" obligations—like ghosts of classifications past. Some "moderate" SIP requirements, EPA says, are not "tied to" the attainment date, so Texas must still submit "moderate" SIP elements despite having been reclassified to "serious" non-attainment. *See* 89 Fed. Reg. at 5,147. But contrary to EPA's interpretation, the Act ties the requirements of SIP submittals to *classifications*, not to their respective attainment deadlines. This is nothing more than an attempt by EPA to close the safety valve that the Act left open and to undermine the discretionary authority of the States to voluntarily request reclassification.

With respect to voluntary reclassification, the Act specifically states that reclassified areas are required to attain "according to the schedules prescribed in connection with [the new classification's] requirements." 42 U.S.C. § 7511a(i). Indeed, Texas's obligations for these areas depend entirely upon their classification, and the Act makes no material distinction between originally classified and newly reclassified areas. *See id.* § 7511(b)(2)(A). Take, for instance, Texas's control-technology requirement for its SIP submittal. Regulations governing these submittals distinguish between control-technology submittals needed for "initial nonattainment area designations" and those needed "pursuant to reclassification" because the regulations

recognize that the corresponding SIP submittal timelines should change as the area is reclassified. *See* 40 C.F.R. § 51.1312. When a State seeks a voluntary reclassification, the SIP submittals change alongside the reclassification, especially where a State has not yet submitted a control-technology submittal for the classification that is changing and therefore will provide its control-technology submittal as part of its submittals for the new classification.

Not only is EPA's theory artificial, but it is also internally inconsistent. EPA claims that some SIP elements are tied to the attainment date and therefore it would "make no logical or practical sense" for EPA to require them. *See* 89 Fed. Reg. at 5,147. But the elements that EPA says are not so "tied" plainly are. Consider the "reasonable further progress" requirements. The Act plainly requires that a State's "plan shall provide for such specific annual reductions in emissions of" certain pollutants to attain the NAAQS "*by the attainment date* applicable under this chapter." 42 U.S.C. § 7511a(b)(1)(A) (emphasis added). And to prove the State's plan has met its goals, the State must demonstrate the plan "will result" in reduced emissions "from the baseline emissions . . . *until the attainment date.*" *Id.* § 7511a(c)(2)(B) (emphasis added). The control-technology submittal is similarly tied to the reductions as of the "date of attainment." *Id.* § 7511a(b)(2)(A). The attainment date, the classification status, and the SIP requirements are all "tied to" each other under the Act. This internal logical inconsistency shows that EPA's statutory approach is unlawful. *See Chamber of Com. of U.S. v. U.S. Dep't of Lab.*, 885 F.3d 360, 382 (5th Cir. 2018) ("Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action.").

Laid bare, EPA's efforts are based on its policy preferences, not its statutory authority. But "agencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions." *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019). EPA says that "[c]hanging the submission requirement or implementation deadlines for these elements" would not achieve EPA's goals as quickly as "the [Act] intended." *See* 89 Fed. Reg. at 5,147. But the surest sign of Congress's intent is the text it chose, and the Act explicitly envisions a tradeoff: States get more time to achieve attainment if they take on more stringent requirements. EPA has no statutory authority to alter that arrangement and strip the States of the benefit of their bargain and the advantages that the Act has granted to States by authorizing them to voluntarily request reclassification.

"It is beyond cavil that the EPA may consider only the requirements of the [Act] when reviewing SIP submissions." *Luminant*, 675 F.3d at 926. By constructing an artificial distinction between requirements tied to and untethered from attainment dates, EPA imposed requirements not found in the Act. Therefore, to the extent Texas's reclassification left certain SIP elements in place for prior classifications, EPA's action must be set aside in part.

## II. The Final Rule Undercuts Texas's Good-Faith Reliance on Existing Agency Policy.

**A.** "Dealing with administrative agencies is all too often a complicated and expensive game, and players like [Texas] are 'entitled to know the rules.'" *R.J. Reynolds*, 65 F.4th at 189 (quoting *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999), *abrogated on other grounds by Perez v. Mortg. Bankers Ass'n*, 575 U.S.

92 (2015)). Consequently, "agencies must give notice of conduct the agency 'prohibits or requires' and cannot 'surprise' a party by penalizing it for 'good-faith reliance' on the agency's prior positions." *R.J. Reynolds*, 65 F.4th at 189 (quoting *Christopher*, 567 U.S. at 156-57). Courts "refuse[] to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities." *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *accord Azar v. Allina Health Servs.*, 587 U.S. 566, 571 (2019) (acknowledging the "surprise switcheroo" doctrine); *R.J. Reynolds*, 65 F.4th at 189 n.6 (same). Thus, "even when an agency lawfully changes its position, it cannot fault a party for relying in good faith on the prior one." *White Lion*, 90 F.4th at 384. In fact, before adopting a rule, an agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33.

A corollary to this principle is that when an agency reverses "prior policy," it must provide a "detailed justification" for doing so, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009), and "must take into account 'serious reliance interests' its 'longstanding policies may have engendered' along with 'alternatives that are within the ambit of the existing policy,'" *R.J. Reynolds*, 65 F.4th at 189 (quoting *Regents*, 591 U.S. at 30). An agency cannot change course without "good reasons," and "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television*, 556 U.S. at 515-16. And regardless of how "the agency justifies its new position, what it may not do is 'gloss[] over or swerve[] from prior precedents without discussion.'"

*Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 645 (D.C. Cir. 2020) (quoting *Sw. Airlines v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)).

**B.**   EPA's Final Rule violates these commonsense bounds on agency behavior. To start, EPA did not "display awareness that it *is* changing position." *See Fox Television*, 556 U.S. at 515. But EPA undoubtedly took a firm position in the previous rulemaking, *White Lion*, 90 F.4th at 381, which certainly engendered serious reliance interests, *see R.J. Reynolds*, 65 F.4th at 189 (citing *Regents*, 591 U.S. at 30). For example, in the Final Rule reclassifying areas, EPA described voluntary reclassification as a way "to anticipate and manage the tight timeframes for SIP development and submission." 87 Fed. Reg. at 60,907. The multiple responses to comments reflect that EPA's position created reliance on behalf of regulated entities. *E.g.*, *id.* ("[T]here are proactive and voluntary pathways by which states can anticipate and manage the tight timeframes to develop required SIP revisions for reclassified nonattainment areas."); *id.* at 60,909 (noting that the "voluntary pathways" include "voluntary reclassification"); *id.* ("[V]oluntary reclassification provides another way for states to anticipate and manage the tight timeframes for SIP development for nonattainment areas."). And EPA's position was that the decision to reclassify falls on the States, not EPA: "The EPA cannot, under the [Act], reclassify areas that it knows will not attain or are unlikely to attain by the attainment date; *but states are fully within their rights to recognize this and put themselves in a better position for longer planning and implementation timeframes.*" *Id.* at 60,910 (emphasis added). With EPA's encouragement, that is exactly what Texas did.

By the time EPA issued the finding of failure to submit, *see* C.I. 2, 88 Fed. Reg. at 71,758, it needed to fulsomely address Texas's good-faith reliance on EPA's repeated reassurances that voluntary reclassification would provide an extended timeframe to meet the Act's required deadlines. *See White Lion*, 90 F.4th at 381. Governor Abbott's request for reclassification was then pending before EPA, and its inclusion in the administrative record confirms that the relevant decisionmakers considered it (or at least should have considered it) before finalizing the challenged action. *See Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981) (Higginbotham, J.) (mem. op.) (explaining that the administrative record comprises "all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position" (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951)).

At a minimum, EPA was obligated to explain why the voluntary reclassification would *not* be a means for Texas to "manage the tight timeframes for SIP development for nonattainment areas." 87 Fed. Reg. at 60,909. EPA did not do so before the finding of failure to submit, nor did it address Petitioners' reliance interests in the Final Rule. In response to comments to the Final Rule that EPA "repeatedly reassured" Petitioners "that voluntary reclassification would provide an extended timeframe to meet the [Act's] deadlines," and EPA did not dispute that Petitioners maintained good-faith reliance interests in those reassurances. 89 Fed. Reg. at 51,831. In fact, EPA explicitly acknowledged those interests by admitting that "reclassification can have the practical effect of providing more time to develop and implement plans to meet an area's attainment date." *Id.* But EPA attempted to

downplay those interests and the shift from existing policy by claiming that EPA lacks the "authority to extend existing deadlines associated with a prior nonattainment classification." *Id.*; *see White Lion*, 90 F.4th at 381 ("An agency cannot shift its understanding of the law between those two times, deny or downplay the shift, and escape vacatur under the APA."). EPA is wrong about its statutory authority. *See infra* 21-26. And, regardless, the change-in-position doctrine requires far more. *White Lion*, 90 F.4th at 381. On this basis alone, the Final Rule should be partially set aside.

## III. The Final Rule Is Arbitrary and Capricious.

**A.** The APA prohibits agencies from taking any action that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). And this Court must "hold unlawful and set aside" any "agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A), (C); *accord* 42 U.S.C. § 7607(d)(9)(A), (C). Agency action is arbitrary and capricious when it is "premised on reasoning that fails to account for 'relevant factors' or evinces a 'clear error of judgment.'" *M.D. Anderson Cancer Ctr.*, 985 F.3d at 475 (quoting *Marsh*, 490 U.S. at 378). Indeed, the APA's arbitrary-and-capricious standard is tantamount to a standard of reasonableness or rationality. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). Put simply, it "requires that agency action be reasonable and reasonably explained." *Prometheus Radio*, 592 U.S. at 423. An agency's "[s]udden and unexplained change" to existing policy "may be arbitrary, capricious, or an abuse of discretion." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (cleaned up).

**B.** Here, EPA's Final Rule requiring Texas to submit "moderate" SIP requirements was arbitrary and capricious because EPA failed to reasonably explain why a State would be bound by previous classification requirements after voluntarily reclassifying to a new status. EPA received numerous comments explaining in detail why this part of the Final Rule is arbitrary and cannot meet the APA's standard of reasonableness or rationality. For example, TCEQ explained to EPA in comments during the rulemaking process it had "concerns about the feasibility of meeting compressed attainment deadlines," and that "EPA repeatedly reassured states, including Texas, that voluntary reclassification would provide an extended timeframe to meet [the Act's] deadlines." C.I. 11, TCEQ Comments at 1.

Yet EPA's "proposed rule is inconsistent" with its prior encouragement to States to reclassify to adjust attainment deadlines because the rule "continues to hold Texas to moderate nonattainment area deadlines." *Id.* EPA's arbitrary position that Texas must meet "moderate" deadlines "would be in addition to required SIP revisions for severe nonattainment areas," and it would require "a substantial amount of time" to undertake a "complex process [that] will require Texas to commit significant resources to address" these additional SIP requirements. *Id.* at 2. TCEQ agreed with EPA "that requiring the state to submit (or EPA to act on) superseded SIP elements would make no logical or practical sense" and recognized that "EPA's proposal to require Texas to continue to meet moderate [requirements] . . . does not align with EPA's rationale in its Clean Data Policy," which reflects EPA's prior position. *Id.* at 3. As TCEQ explained, "EPA has not identified a

rationale for treating the nature of these elements differently in the context of voluntary reclassification." *Id.*

And as the Texas Chemistry Council explained in its comments to EPA, EPA's position that Texas must meet "moderate" requirements is irrational because "the Act is explicit that a state has authority to request voluntary reclassification, and therefore to moot all elements required under the prior classification." C.I. 10, TCC Comments at 3. Both the Council and the Texas Oil & Gas Association explained that "[i]t is not logical to impose requirements or to continue sanction clocks associated with deadlines that have already passed for an area that will be subject to a more severe classification" and that requiring Texas to meet "moderate" requirements "has no basis in the statute and arbitrarily turns these elements into duplicative burdens." *Id.* at 4; C.I. 9, TXOGA Comments at 4. What is worse is that "EPA's interpretation directly conflicts with the concept that a voluntary reclassification is available to states in order to allow more time to develop and implement a plan to attain the NAAQS at the cost of having to implement more stringent requirements for the higher nonattainment classification." C.I. 10 at 4; C.I. 9 at 4.

EPA's Final Rule fails to provide any rational response to these concerns. In response to comments addressing voluntary reclassification, EPA claims that the statutory text "clearly requires that Serious areas meet Moderate area requirements in addition to Serious area requirements." 89 Fed. Reg. at 51,831. But EPA merely references the Act's discussion on reclassification, not deadlines. And EPA's repeated reassurances to States reflect a policy that allows States to voluntarily reclassify to avoid the prior classification deadline requirements. EPA's requirements as

reflected in the Final Rule, however, are arbitrary, and EPA has not even attempted to reasonably explain them.

In fact, EPA's repeated encouragement to States to voluntarily reclassify served a crucial purpose: providing a shield against an arbitrary-or-capricious challenge to what even EPA admitted was a tight SIP-submission schedule. Although EPA generally has discretion to set that schedule following a reclassification, *see* 42 U.S.C. § 7511a(i), EPA's exercise of discretion still must comport with the APA, *see* 5 U.S.C. § 551(13) (defining agency action). By telling States that they could avoid the difficulties of complying with the three-month SIP-submission deadline by seeking voluntary reclassification, EPA tried to show regulated parties (and the federal courts, if a dispute reached that forum) that its action was not arbitrary or capricious. EPA's sudden and complete change in position exposes EPA to the very challenge from which it sought to shield itself, and this Court should not attempt to protect EPA from the consequences of its irrational and unexplained alteration to policy.

## Conclusion

The Court should vacate and set aside the portion of the Final Rule requiring Texas to submit the remaining "moderate" plan requirements before SIP revisions are due for the higher "serious" nonattainment designation.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Aaron L. Nielson
Solicitor General

William F. Cole
Deputy Solicitor General

/s/ Kateland R. Jackson
Kateland R. Jackson
Assistant Solicitor General
Kateland.Jackson@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

*Counsel for State of Texas and Texas Commission on Environmental Quality*

/s/ Aaron M. Streett
Aaron M. Streett
Matthew L. Kuryla
Beau Carter
Baker Botts L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855 (phone)
(713) 229-7855 (fax)
aaron.streett@bakerbotts.com

*Counsel for Business Coalition for Clean Air, Texas Oil & Gas Association, and Texas Chemistry Council*

## CERTIFICATE OF SERVICE

On November 26, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Kateland R. Jackson
KATELAND R. JACKSON

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,767 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Kateland R. Jackson
KATELAND R. JACKSON